**POMERANTZ LLP**
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
        taweinrib@pomlaw.com

*Counsel for Plaintiff*

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDGARDO CANEZ, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INTELLIGENT SYSTEMS CORPORATION, J. LELAND STRANGE, MATTHEW A. WHITE, A. RUSSEL CHANDLER III, PHILLIP H. MOISE, PARKER H. PETIT, CHERIE M. FUZZELL, JAMES V. NAPIER, BONNIE L. HERRON, AND KAREN J. REYNOLDS, | Case No: 1:19-cv-03949-ARR-CLP<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Edgardo Canez ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Intelligent Systems Corporation ("Intelligent Systems" or the

"Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Intelligent Systems securities from May 23, 2014 through May 29, 2019, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Intelligent Systems is a "fintech" company that, through its subsidiary CoreCard Software, Inc., provides technology solutions and processing services to the financial technology and services market in the United States and European Union.

3.      Throughout the Class Period, Defendants filed Forms 10-K and Proxy Statements with the SEC that purported to identify every related party transaction and relationship. Moreover, in the Proxy Statements, Intelligent System's Board of Directors ("Board") represented that Director Defendant Parker Petit qualified both as an "independent" director and as a "financial expert."

4.      Defendants' Class Period statements, set forth below, were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendant Petit, a senior member of the Board and the "financial expert" on the Company's Audit Committee, engaged in pervasive accounting fraud as the CEO of MiMedx Group and directed an effort to retaliate against whistleblowers; (2) Defendant Petit

did not qualify as an "independent" Director; (3) the Company's CEO, Defendant Strange, engaged in undisclosed related-party transactions with Defendant Petit and others and had an undisclosed personal relationship with the Company's auditor; and (4) the Company engaged in undisclosed related-party transactions.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and subsequent damages took place in this judicial district.

8.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

9.      Plaintiff, as set forth in the certification previously filed with this court and incorporated by reference herein, purchased Intelligent Systems securities during the Class Period and was economically damaged thereby.

10.      Defendant Intelligent Systems purports to primarily engaged in the business of providing technology solutions and processing services to the financial technology and services market. Intelligent Systems is incorporated in Georgia and its principal executive offices are

located at 4355 Shackleford Road, Norcross, Georgia 30093. The Company's stock trades on the NYSE American under the ticker symbol "INS."

11.     Defendant J. Leland Strange ("Strange") has served as the Company's President since 1983 and its Chief Executive Officer ("CEO") and Chairman of the Board since 1985.

12.     Defendant Matthew A. White ("White") has served as the Company's Chief Financial Officer ("CFO") and Secretary since January 2019.

13.     Defendant Bonnie L. Herron ("Herron") served as the Company's CFO from 1999 until June 22, 2016.

14.     Defendant Karen J. Reynolds ("Reynolds") served as the Company's CFO from June 2016 until January 2019.

15.     Defendant A. Russell Chandler III ("Chandler") has served as a Director of the Company since 2017.

16.     Defendant Phillip H. Moise ("Moise") has served as a Director of the Company since 2013.

17.     Defendant Cherie M. Fuzzell ("Fuzzell") served as a Director of the Company from 2012 until her resignation on September 23, 2017.

18.     Defendant James V. Napier ("Napier") served as a Director of the Company from 1982 until his retirement on June 11, 2015.

19.     Defendant Parker H. Petit ("Petit") has served as a Director of the Company since 1996. Defendant Parker is a member of Intelligent Systems' Audit Committee and was CEO of the MiMedx Group, Inc. ("MiMedx Group") from February 2009 until June 2018.

20.     Defendants Strange, White, Chandler, Moise, Fuzzell, Herron, Reynolds, Napier and Petit are collectively referred to herein as the "Individual Defendants."

21.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

22.     Intelligent Systems is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because the wrongful acts complained of herein were carried out within the scope of their employment.

23.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Intelligent Systems under *respondeat superior* and agency principles.

24.     Defendants Intelligent Systems and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Intelligent Systems is a "fintech" company that, through its subsidiary CoreCard Software, Inc., provides technology solutions and processing services to the financial technology and services market in the United States and European Union. According to the Company's Bylaws, "All corporate powers shall be exercised by or under the authority of, and the business and affairs of the Corporation shall be managed by, the Board of Directors…"

### The Board's Code of Conduct

26.     Intelligent System's Board adopted a Code of Conduct ("Code"), which applied to all employees of the Company, including its subsidiaries, at all relevant times.  The Code, *inter alia*, proscribes conduct creating any conflict of interest between an employee and the Company and requires "full, fair, accurate, timely, and understandable disclosure to shareholders of all material information regarding our business."  Specifically, the Code states:

> **Conflicts of Interest** You must avoid any conflict, or the appearance of a conflict, between your personal interests and the interests of the Company. A conflict exists when your personal interests in any way interfere with the interests of the Company as a whole, or when you take any action or have any interest that may make it difficult for you to perform your job objectively and effectively. For example, a conflict of interest probably exists if: • you cause the Company to enter into business relationships with you or a member of your family; • you use any nonpublic information about the Company, our suppliers, our customers, or our other business partners for your personal gain, or the gain of a member of your family; • you or a family member receive a loan, or guarantee of a loan or other obligation, as a result of your position with the Company; You must disclose any conflicts of interest, or any action or relationship that might give rise to a conflict, to Matt White, Chief Financial Officer, who is the Designated Officer at the Company's corporate office, 770- 381-2900. In the event the Designated Officer is involved in the action or relationship giving rise to the conflict of interest, you should disclose the conflict to any other member of management or to a member of the board of directors.

*\*\**

**__Public Disclosure__** The Company is committed to a policy of full, fair, accurate, timely, and understandable disclosure to shareholders of all material information regarding our business. This policy extends to our filings with the Securities and Exchange Commission (the "SEC") and to all other public communications. All individuals involved in our SEC reporting process and in preparing and making public communications regarding our business must take all reasonable steps to comply with this policy. Addressing Mistakes; Business Records Mistakes should never be covered up, but should be immediately fully disclosed to your supervisor so that they can be corrected. Business records must be kept accurately, honestly, and in accordance with all relevant accounting, recordkeeping, document retention and similar standards. Falsification of any of the Company or third party records is never permitted.

27.     The Code also makes clear that the Company and each of its employees "has a duty to comply with all laws, rules and regulations that apply to our business."  Included on that list has always been a provision to ensure the protection of "an employee who engages in [] 'whistleblower' activities."   In fact, the Code of Conduct implores its employees to report violations of applicable laws, rules, or regulations, or this Code either to the "Designated Officer" *or to a senior member of the Board*.

28.     However, one of the most senior members of the Board, Parker Petit, engaged in egregious accounting malfeasance and directed an endeavor to retaliate against whistleblowers as CEO of MiMedx, and during his tenure on Intelligent System's Board, which resulted in his resignation from MiMedx (later altered by MiMedx to a "termination for cause") and rendered him unqualified to uphold, much less implement, the provisions of the Code.

29.     The Code further provides that violations of its provisions will result in dismissal. However, the Company did not dismiss Defendant Petit though knowing that he engaged in related party transactions that violated the "conflict of interest" provision of the Code and falsely represented himself as a "financial expert" and an "independent" director in Intelligent System's proxy statements in violation of the "public disclosure" provision of the Code. While the Code

provides that it can be waived for "an executive officers or member of our Board of Directors," it also provides that any such waiver "must be promptly disclosed to shareholders in accordance with SEC rules."  Defendants did not disclose any such waiver during the Class Period.

### Related Party Transactions

30.     In addition to the conflict of interest provision of its Code, as a publicly traded company, Intelligent Systems is required to adhere to Generally Accepted Accounting Principles ("GAAP"), which includes the Statement of Financial Accounting Standards ("SFAS").

31.     SFAS 57 requires companies to report related-party transactions on their financial statements.  According to SFAS 57, a "related party" is one that "can significantly influence the management or operating policies of the transacting parties" or that "has an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests."

32.     SFAS 57 provides that when a company engages in "material related party transactions," it "shall" disclose in its financial statements the following:

a. The nature of the relationship(s) involved

b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements

c. The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period [and]

d. Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

33.     Each of Intelligent System's annual reports filed on Form 10-K during the Class Period, purported to identify the Company's only related party transaction.  However, as set forth

below, not a single Class Period filing revealed additional related party transactions involving the Company, Defendant Petit, and/or Defendant Strange.

**Defendant Petit**

34.     Throughout the Class Period, Defendant Petit sat on the Intelligent Systems Board as well as its Audit Committee and Compensation Committee.   In proxy statements filed throughout the Class Period, Board members represented that Defendant Petit qualified as a "financial expert" based on his "experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies."  Specifically, from 2009 until his "resignation" in 2018, Defendant Petit held the roles of Chairman of the Board of Directors and CEO of MiMedx Group.

35.     However, Defendant Petit did not qualify as a "financial expert" and should not have held a position on the Intelligent Systems' Board or any of its committees.  An internal investigation at MiMedx uncovered that, as CEO, Defendant Petit went to elaborate lengths to hide pervasive accounting malfeasance.   For example, and as set forth more fully below, Defendant Petit made false statements to the SEC and the MiMedx Board of Directors, submitted false documents to the auditors, "purposely took action to disregard revenue recognition rules under GAAP" and directed "Project Snow White," which involved a secret surveillance system used to retaliate against whistleblowers.   This led MiMedx to retroactively alter Defendant Petit's resignation to a termination for cause.

36.     In addition to falsely identifying Defendant Petit as a "financial expert," the Board also represented at all relevant times that Defendant Petit qualified as an "independent director."   In reality, Defendants Petit and Strange had undisclosed financial dealings that disqualified Petit as "independent."   For example, Defendants Petit and Strange partnered

together on real estate deals in Naples, Florida as co-officers of a Florida entity named Atrix Realty, Inc.  Defendant Strange also held the role of Director at Healthdyne Technologies, one of Defendant Petit's old companies.  Defendants Petit and Strange are also both listed as Trustees Emeritus of the Georgia Tech Foundation along with Defendant Chandler, who has appeared with Defendant Petit in filings related to the GRA Venture fund.

## Additional Undisclosed Relationships

37.     In addition to his undisclosed dealings with Defendant Petit, Defendant Strange had an undisclosed relationship with Intelligent System's "independent auditor," Nicolas Cauley. The SEC requires that auditors be "capable of exercising objective and impartial judgement on all issues."   However, Defendant Strange and Ian Waller—Nicolas Cauley's engagement partner—served as leaders of the same church and lead a five-month development process together.

38.     Defendants also failed to disclose in the Company's SEC filings that Intelligent Systems made investments in a company called Lumense even though Defendant Strange was Chairman of Lumense at the time.

39.     Moreover, per the Company's 10-K filed on March 15, 2018, Intelligent Systems loaned $235,000 to an unidentified "private limited company in India in the FinTech industry." One month later, the Company signed a processing agreement with that startup for CoreCard services.   Defendants failed to disclose that the startup is Flexopt Technology, a company founded by Anupam Pathak—the managing director of Intelligent System's India subsidiary, ISC Software Private Limited.  Flexopt's financial statements filed with the Indian Ministry of Corporate Affairs show the $235,000 payment.  Flexopt was registered just eight months before the investment took place.  The processing agreement for CoreCard services amounts to *at least the $235,000 investment that Intelligent Systems made in Flexopt.*  With $0 in revenue, Flexopt

10

used the $235,000 loan to pay for CoreCard's services—roundtripping the Company's loan right back to it.  Defendants did not disclose this when purporting to identify related party transactions in the Company's Class Period filings.

40.     Additionally, Neeti Pathak is listed as a Director of ISC along with Anupam Pathak.  Neeti Pathak is also a director at New Vision Softcom Consultancy.  New Vision is listed as a major accounts payable vendor for Flexopt.  With zero third party revenues to fund its expenses, Flexopt would have had to use the loan from Intelligent Systems to pay New Vision, another company founded by an Intelligent Systems employee.  Defendants did not disclose this when purporting to identify related party transactions in the Company's Class Period filings.

**Materially False and Misleading Statements**

41.     The Class Period beings on May 23, 2014 when Intelligent Systems filed a Form 8-K announcing that, At the Annual Meeting of Shareholders of Intelligent Systems Corporation ("Registrant") on May 22, 2014, shareholders elected Cherie M. Fuzzell and Parker H. Petit to the board of directors, to serve until the 2017 Annual Meeting. A total of 6,467,239 shares were voted at the meeting."  6,251,623 shareholders voted for Mr. Petit and 215,616 shareholders voted against.  The shareholders voted based on the Board of Directors' representations in a proxy statement filed on April 4, 2014 ("2014 Proxy Statement") stating:

> Parker (Pete) H. Petit has served as a director since 1996 and is nominated for re-election to the Board for a three-year term ending at the 2017 Annual Meeting of Shareholders. Mr. Petit is the Chairman, President and CEO of MiMedx Group, an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit is also the President of The Petit Group, a private investment company. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. He also served as a director of Logility, Inc. within the past five years. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a

director of the company. *The Board has determined that Mr. Petit is an independent director under the applicable rules of NYSE MKT*.

***

During 2013, the Audit Committee consisted of Ms. Fuzzell and Messrs. *Petit* and Napier (chair). In 2013, the Audit Committee appointed the company's independent auditor, met with the independent auditor to review its report on the 2012 audit and the 2013 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.

*All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE MKT. The Board has determined that Mr. Petit and Mr. Napier are financial experts as defined by the rules of the SEC, and are financially sophisticated as defined in the listing standards of NYSE MKT. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies.* Mr. Napier's experience includes serving on the audit committees of several large publicly traded companies as well as serving in executive positions and as the chairman of publicly traded companies.

The Board has a Compensation Committee consisting of three *independent directors*, Messrs. Napier and *Petit* and Ms. Fuzzell. The Compensation Committee met once in 2013. The Compensation Committee reviews, makes recommendations and approves the appropriate compensation level for the officers of the company and any changes in the company's various benefit plans covering executive officers or directors. The Compensation Committee does not have a charter. Neither the Compensation Committee nor management has engaged a compensation consultant to provide advice or recommendations on the form or amount of executive or director compensation. From time to time, the Compensation Committee has sought input from publicly available data compiled by executive officers of the company relating to compensation paid to executive officers and directors in similar size, publicly traded companies in the same geographic area as the company is located. The Compensation Committee has also solicited input from the CEO with respect to compensation of non-CEO executive officers.

***

Currently, Cherie M. Fuzzell, James V. Napier, *Parker H. Petit* and Philip H. Moise, all of whom *meet the applicable NYSE independence requirements*, participate in the consideration of director nominees. The same individuals also nominate the officers of the company for election by the Board of Directors.

42.     Board members included J. Leland Strange, Cherie M. Fuzzell, Philip H. Moise, and James V. Napier.

43.     The foregoing statements were false and misleading because shareholders voting to elect Mr. Petit to the Board of Directors had not been told that Mr. Petit did not qualify as an independent director or financial expert because he engaged in related party transactions with Mr. Strange, engaged in pervasive accounting fraud as CEO of MiMedx Group, and directed a secret surveillance system at MiMedx to retaliate against whistleblowers.

44.     On February 18, 2015, Intelligent Systems filed its annual report on Form 10-K for the fiscal year ended December 31, 2014 ("2014 10-K"), signed by the members of the Board of Directors including Defendants Strange, Petit, Moise, Napier, Fuzzell, and Heron. The 2014 10-K contained a section titled, "Certain Relationships And Related Transactions, And Director Independence," which stated:

> The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by J. Leland Strange, our Chairman and Chief Executive Officer. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. We paid ISC Properties, LLC $468,000 and $467,000 in the years ending December 31, 2014 and 2013, respectively.
>
> Please refer to the subsection entitled "Proposal 1 - The Election of Two Directors - Nominees" in the Proxy Statement referred to in Item 10 for information regarding the independence of the company's directors. This information is incorporated into this Item 13 by reference.

The 2014 10-K also contained a section titled, "Related Party Transaction," which only covered Defendants Strange's relationship with ISC Properties, LLC.

45.     The foregoing statements were false and misleading because they misrepresented and failed to disclose that Defendant Strange, had an undisclosed relationship with and engaged in undisclosed related-party transactions with Defendant Petit and others, had an undisclosed

personal relationship with the Company's auditor, and the Company engaged in undisclosed related-party transactions.

46.     On April 13, 2015, Intelligent Systems filed a Proxy Statement for its annual meeting of shareholders to be held June 11, 2015 (the "2015 Proxy Statement"). In the 2015 Proxy Statement, Board members Strange, Fuzzell, Moise, Napier and Petit represented that:

> Currently, Cherie M. Fuzzell, James V. Napier, Parker H. Petit and Philip H. Moise, all of whom meet the applicable NYSE independence requirements, participate in the consideration of director nominees. The same individuals also nominate the officers of the company for election by the Board of Directors.
>
> ***
>
> *Parker (Pete) H. Petit* has served as a director since 1996. Mr. Petit is the Chairman, President and CEO of MiMedx Group, an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit is also the President of The Petit Group, a private investment company. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. He also served as a director of Logility, Inc. within the past five years. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. The Board has determined that Mr. Petit is an independent director under the applicable rules of NYSE MKT.
>
> ***
>
> During 2014, the Audit Committee consisted of Ms. Fuzzell (chair) and Messrs. Petit, Moise and Napier. In 2014, the Audit Committee appointed the company's independent auditor, met with the independent auditor to review its report on the 2013 audit and the 2014 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.
>
> All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE MKT. The Board has determined that Mr. Petit and Mr. Napier are financial experts as defined by the rules of the SEC, and are financially sophisticated as defined in the listing standards of NYSE MKT. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies. Mr. Napier's experience includes serving on the

audit committees of several large publicly traded companies as well as serving in executive positions and as the chairman of publicly traded companies.

The Board has a Compensation Committee consisting of four independent directors, Messrs. Napier, Moise and Petit and Ms. Fuzzell.

The 2015 Proxy Statement further contained a section titled, "Certain Relationships and Related Transactions," which stated:

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by our Chairman and Chief Executive Officer, J. Leland Strange. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. In the years ended December 31, 2014 and 2013, we paid $468,000 and $467,000, respectively, in rent to ISC Properties, LLC, which the company believes to be market rate.

47.     The foregoing statements were false and misleading for the reasons set forth in ¶ 45.  Moreover, the foregoing statements misrepresented and failed to disclose that Defendant Petit, a senior member of the Board and the "financial expert" on the Company's Audit Committee, engaged in pervasive accounting fraud as the CEO of MiMedx Group, directed an effort to retaliate against whistleblowers, and did not qualify as an "independent" director due to an undisclosed relationship and related party transactions with Defendant Strange.

48.     On March 16, 2016, Intelligent Systems filed its annual report on Form 10-K for the fiscal year ended December 31, 2015 ("2015 10-K"), signed by the members of the Board of Directors including Defendants Strange, Petit, Moise, Fuzzell, and Herron. The 2015 10-K contained a section titled, "Certain Relationships And Related Transactions, And Director Independence," which stated:

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by J. Leland Strange, our Chairman and Chief Executive Officer. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. We paid ISC Properties, LLC $275,000 and $468,000 in the years ending December 31, 2015 and 2014, respectively. Simultaneous with the sale of our ChemFree subsidiary on March 31, 2015, we renewed our facility lease with ISC Properties, Inc. and reduced the amount of space leased.

Please refer to the subsection entitled "Proposal 1 - The Election of One Director - Nominee" in the Proxy Statement referred to in Item 10 for information regarding the independence of the company's directors. This information is incorporated into this Item 13 by reference.

The 2015 10-K also contained a section titled, "Related Party Transaction," which only covered Defendants Strange's relationship with ISC Properties, LLC.

49.    The foregoing statements were false and misleading for the reasons set forth in ¶ 45.

50.    On April 1, 2016, Intelligent Systems filed a Proxy Statement for its annual meeting of shareholders to be held May 26, 2016 (the "2016 Proxy Statement").  In the 2016 Proxy Statement, Board members Strange, Fuzzell, Moise, and Petit represented that:

Parker (Pete) H. Petit has served as a director since 1996. Mr. Petit is the Chairman, President and CEO of MiMedx Group, an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit is also the President of The Petit Group, a private investment company. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. The Board has determined that Mr. Petit is an independent director under the applicable rules of NYSE MKT.

*** 

During 2015, the Audit Committee consisted of Ms. Fuzzell (chair) and Messrs. Petit and Moise. In 2015, the Audit Committee appointed the company's new independent auditor, met with the former independent auditor to review its report on the 2014 audit and the 2015 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.

All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE MKT. The Board has determined that Mr. Petit is a financial expert as defined by the rules of the SEC, and is financially sophisticated as defined in the listing standards of NYSE MKT. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies.

16

The Board has a Compensation Committee consisting of three independent directors, Messrs. Moise and Petit and Ms. Fuzzell. The Compensation Committee met twice in 2015.

***

Currently, Cherie M. Fuzzell, Parker H. Petit and Philip H. Moise, all of whom meet the applicable NYSE independence requirements, participate in the consideration of director nominees. The same individuals also nominate the officers of the company for election by the Board of Directors.

With regard to "Certain Relationships and Related Transactions," the 2016 Proxy Statement stated as follows:

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by our Chairman and Chief Executive Officer, J. Leland Strange. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. In the years ended December 31, 2015 and 2014, we paid $275,000 and $468,000, respectively, in rent to ISC Properties, LLC, which the company believes to be market rate.

51.     The foregoing statements were false and misleading for the reasons set forth in ¶¶ 45, 47.

52.     On March 17, 2017, Intelligent Systems filed its annual report on Form 10-K for the fiscal year ended December 31, 2016 ("2016 10-K"), signed by the members of the Board of Directors including Defendants Strange, Petit, Moise, Fuzzell, and Reynolds. The 2016 10-K contained a section titled, "Certain Relationships And Related Transactions, And Director Independence," which stated:

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by J. Leland Strange, our Chairman and Chief Executive Officer. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. We paid ISC Properties, LLC $210,000 and $275,000 in the years ending December 31, 2016 and 2015, respectively. Simultaneous with the sale of our ChemFree subsidiary on March 31, 2015, we renewed our facility lease with ISC Properties, Inc. and reduced the amount of space leased.

Please refer to the subsection entitled "Proposal 1 - The Election of Two Directors - Nominees" in the Proxy Statement referred to in Item 10 for information

regarding the independence of the company's directors. This information is incorporated into this Item 13 by reference.

The 2016 10-K also contained a section titled, "Related Party Transaction," which only covered Defendants Strange's relationship with ISC Properties, LLC.  Regarding related parties, the 2016 10-K also stated:

> In October 2016, the FASB issued ASU 2016-17, Consolidation (Topic 810): Interests Held though Related Parties that are Under Common Control, which amends the consolidation guidance on how a reporting entity that is the single decision maker of a variable interest entity (VIE) should treat indirect interests in the entity held through related parties that are under common control with the reporting entity when determining whether it is the primary beneficiary of that VIE. Under the amendments, a single decision maker is not required to consider indirect interests held through related parties that are under common control with the single decision maker to be the equivalent of direct interests in their entirety. Instead, a single decision maker is required to include those interests on a proportionate basis consistent with indirect interests held through other related parties. This guidance is effective for public business entities for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. Early application is permitted. We are currently evaluating the impact this guidance will have on our consolidated financial statements.

53.    The foregoing statements were false and misleading for the reasons set forth in ¶ 45.

54.    On April 5, 2017, Intelligent Systems filed a Proxy Statement for its annual meeting of shareholders to be held May 25, 2017 (the "2017 Proxy Statement").  In the 2017 Proxy Statement, Board members Strange, Fuzzell, Moise, and Petit represented that:

> Parker (Pete) H. Petit has served as a director since 1996 and is being nominated for re-election to the Board for a three year term ending in 2020. Mr. Petit is the Chairman, President and CEO of MiMedx Group, Inc., an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit is also the President of The Petit Group, a private investment company. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the

18

company. The Board has determined that Mr. Petit is an independent director under the applicable rules of NYSE MKT.

\*\*\*

During 2016, the Audit Committee consisted of Ms. Fuzzell (chair) and Messrs. Petit and Moise. In 2016, the Audit Committee appointed the company's independent auditor to review its report on the 2015 audit and the 2016 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.

All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE MKT. The Board has determined that Mr. Petit is a financial expert as defined by the rules of the SEC, and is financially sophisticated as defined in the listing standards of NYSE MKT. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies.

The Board has a Compensation Committee consisting of three independent directors, Messrs. Moise and Petit and Ms. Fuzzell.

\*\*\*

Currently, Cherie M. Fuzzell, Parker H. Petit and Philip H. Moise, all of whom meet the applicable NYSE independence requirements, participate in the consideration of director nominees. The same individuals also nominate the officers of the company for election by the Board.

55.     The 2017 Proxy Statement also contained a Section titled, "Certain Relationships And Related Transactions," which listed the following as the sole related party transaction:

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by our Chairman and Chief Executive Officer, J. Leland Strange. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. In the years ended December 31, 2016 and 2015, we paid $210,000 and $275,000, respectively, in rent to ISC Properties, LLC, which the company believes to be market rate.

56.     The foregoing statements were false and misleading for the reasons set forth in ¶¶ 45, 47.

57.     On May 26, 2017, Defendants filed a Form 8-K with the SEC stating that at the May 25, 2017 shareholders had voted to re-elect Defendant Petit to the Board of Directors based

on the Board's representations in the 2017 Proxy Statement.  7,161,340 shareholders voted in

favor of Defendant Petit's re-election while 193,964 voted against.

58.     The foregoing statements were false and misleading for the reasons set forth in

¶ 43.

59.     On March 15, 2018, Intelligent Systems filed its annual report on Form 10-K for

the fiscal year ended December 31, 2017 ("2017 10-K"), signed by the members of the Board of

Directors including Defendants Strange, Petit, Moise, Chandler, and Reynolds. The 2017 10-K

contained a section titled, "Certain Relationships And Related Transactions, And Director

Independence," which stated:

> The lease on our headquarters and primary facility at 4355 Shackleford Road,
> Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by J.
> Leland Strange, our Chairman and Chief Executive Officer. Mr. Strange holds a
> 100% ownership interest in ISC Properties, LLC. We paid ISC Properties, LLC
> $210,000 in both years ending December 31, 2017 and 2016.
>
> Please refer to the subsection entitled "Proposal 1 - The Election of One Director -
> Nominee" in the Proxy Statement referred to in Item 10 for information regarding
> the independence of the company's directors. This information is incorporated
> into this Item 13 by reference.

The 2017 10-K also contained a section titled, "Related Party Transaction," which only covered

Defendants Strange's relationship with ISC Properties, LLC.

60.     The foregoing statements were false and misleading for the reasons set forth in

¶ 45.

61.     On April 2, 2018, Intelligent Systems filed a Proxy Statement for its annual

meeting of shareholders to be held May 24, 2018 (the "2018 Proxy Statement").  In the 2018

Proxy Statement, Board members Strange, Fuzzell, Moise, Chandler and Petit represented that:

> Parker (Pete) H. Petit has served as a director since 1996. Mr. Petit is the
> Chairman, President and CEO of MiMedx Group, Inc., an integrated developer,
> manufacturer and marketer of bio-material based products. Mr. Petit is also the
> President of The Petit Group, a private investment company. Mr. Petit served as

20

Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. The Board has determined that Mr. Petit is an independent director under the applicable rules of NYSE American.

*** 

During 2017, the Audit Committee consisted of Ms. Fuzzell (chair), until her resignation on September 23, 2017, when she was succeeded by Mr. Chandler (chair), and Messrs. Petit and Moise. In 2017, the Audit Committee appointed the company's independent auditor to review its report on the 2016 audit and the 2017 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.

All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE American. The Board has determined that Mr. Petit is a financial expert as defined by the rules of the SEC, and is financially sophisticated as defined in the listing standards of NYSE American. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies.

The Board has a Compensation Committee consisting of three independent directors, Messrs. Chandler, Moise (chair) and Petit. Mr. Chandler succeeded Ms. Fuzzell, upon her resignation from the Board, on the committee.

*** 

Currently, A. Russell Chandler, III, Parker H. Petit and Philip H. Moise, all of whom meet the applicable NYSE American independence requirements, participate in the consideration of director nominees. During 2017, Mr. Petit and Mr. Moise participated in the consideration of Mr. Chandler as the nominee to replace Ms. Fuzzell's unexpired term. The same individuals also nominate the officers of the company for election by the Board.

62.     The 2018 Proxy Statement also contained a Section titled, "Certain Relationships And Related Transactions," which listed the following as the sole related party transaction:

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by our Chairman and Chief Executive Officer, J. Leland Strange. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. In both years ended December

31, 2017 and 2016, we paid $210,000 in rent to ISC Properties, LLC, which the company believes to be market rate.

63.     The foregoing statements were false and misleading for the reasons set forth in ¶¶ 45, 47.

64.     On March 13, 2019, Intelligent Systems filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 ("2018 10-K"), signed by the members of the Board of Directors including Defendants Strange, White, Chandler, Moise, and Petit. The 2018 10-K contained a section titled, "Certain Relationships And Related Transactions, And Director Independence," which stated:

> The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by J. Leland Strange, our Chairman and Chief Executive Officer. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. We paid ISC Properties, LLC $210,000 in both years ending December 31, 2018 and 2017.

> Please refer to the subsection entitled "Proposal 1 - The Election of One Director - Nominee" in the Proxy Statement referred to in Item 10 for information regarding the independence of the company's directors. This information is incorporated into this Item 13 by reference.

The 2018 10-K also contained a section titled, "Related Party Transaction," which only covered Defendants Strange's relationship with ISC Properties, LLC.

65.     The foregoing statements were false and misleading for the reasons set forth in ¶ 45.

66.     On April 12, 2019, Intelligent Systems filed a Proxy Statement for its annual meeting of shareholders to be held May 23, 2019 (the "2019 Proxy Statement").  In the 2019 Proxy Statement, Board members Strange, Moise, Chandler and Petit represented that:

> Parker (Pete) H. Petit has served as a director since 1996. Mr. Petit is the President of The Petit Group, a private investment company. Mr. Petit was previously the CEO of MiMedx Group, Inc., an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a

comprehensive disease management services company from 1996 to 2008. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. The Board has determined that Mr. Petit is an independent director under the applicable rules of NYSE American.

*\*\**

During 2018, the Audit Committee consisted of Mr. Chandler (chair) and Messrs. Petit and Moise. In 2018, the Audit Committee appointed the company's independent auditor to review its report on the 2017 audit and the 2018 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.

All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE American. The Board has determined that Mr. Petit is a financial expert as defined by the rules of the SEC, and is financially sophisticated as defined in the listing standards of NYSE American. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies.

The Board has a Compensation Committee consisting of three independent directors, Messrs. Chandler, Moise (chair) and Petit.

*\*\**

Currently, A. Russell Chandler, III, Parker H. Petit and Philip H. Moise, all of whom meet the applicable NYSE American independence requirements, participate in the consideration of director nominees. The same individuals also nominate the officers of the company for election by the Board.

67.     The 2019 Proxy Statement did not reveal that its "financial expert," Defendant Petit, had been terminated for cause for engaging in egregious accounting fraud and retaliating against whistleblowers.

68.     The 2019 Proxy Statement also contained a Section titled, "Certain Relationships And Related Transactions," which listed the following as the sole related party transaction:

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by our Chairman and Chief Executive Officer, J. Leland Strange. Mr. Strange holds a

23

100% ownership interest in ISC Properties, LLC. In both years ended December 31, 2018 and 2017, we paid $210,000 in rent to ISC Properties, LLC, which the company believes to be market rate.

69.     The statements contained in ¶¶ 41-68 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendant Petit, a senior member of the Board and the "financial expert" on the Company's Audit Committee, engaged in pervasive accounting fraud as the CEO of MiMedx Group and directed an effort to retaliate against whistleblowers; (2) Defendant Petit did not qualify as an "independent" Director; (3) the Company's CEO, Defendant Strange, engaged in undisclosed related-party transactions with Defendant Petit and others and had an undisclosed personal relationship with the Company's auditor; and (4) the Company engaged in undisclosed related-party transactions.

**THE TRUTH BEGINS TO EMERGE**

70.     On May 23, 2019, after market hours, MiMedx Group filed a Form 8-K with the SEC that stated that an investigation by its audit committee found that Defendant Petit engaged in accounting fraud when he was CEO of MiMedx Group:

*Non-Reliance on Financial Statements*

First, the Investigation revealed accounting irregularities regarding the recognition of revenue under generally accepted accounting principles ("GAAP"). The Audit Committee, with the concurrence of management, concluded that the Company's previously issued consolidated financial statements and financial information relating to each of the fiscal years ended December 31, 2012, 2013, 2014, 2015 and 2016 and each of the interim periods within such years, along with the unaudited condensed consolidated financial statements included in the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017, would need to be restated. The determination of the need to restate was based on the findings as of June 2018 presented to the Audit Committee, which were primarily focused on the

accounting treatment afforded to the sales and distribution practices with respect to two distributors. The evidence demonstrated that former members of senior management employed certain implicit arrangements, which resulted in a course of dealing that superseded the explicit terms of the contracts, and that the Company improperly recognized revenue from these two distributors.

*Former Members of Management Disregarded Revenue Recognition Rules under Generally Accepted Accounting Principles*

Second, the Investigation found evidence that demonstrated, among other things, that former members of senior management, including Mr. Petit, the Company's former Chief Operating Officer, William C. Taylor, the Company's former Chief Financial Officer, Michael J. Senken, and the Company's former Controller, John Cranston, were aware of the Company's course of dealing with its largest distributor and that this course of dealing was inconsistent with the explicit terms of the contract. Former members of senior management were also aware that this course of dealing included detailed procedures, established as early as 2012, to determine when the distributor would pay for the Company's products.

***

*Material Misstatements and Omissions to Several Key Stakeholders and Regulators*

Fourth, the Investigation found that the evidence demonstrated that after questions began to be raised regarding the Company's accounting practices, Messrs. Petit, Taylor, Senken and Cranston made material misstatements and omissions about the Company's course of dealing with its largest distributor, as well as the Company's corresponding revenue recognition practices, to a number of key stakeholders and regulators, including the Division of Corporation Finance of the U.S. Securities and Exchange Commission (the "SEC"), the Board, the Audit Committee and the Company's outside auditors. These included:

- ... Messrs. Petit, Taylor, Senken and Cranston did not disclose to the Audit Committee or the Company's outside auditors that the Company routinely issued credits to the distributor for lost, damaged or missing tissues, nor did they disclose that the distributor only paid the Company for a tissue after it had sold that tissue to its customer.

- On multiple occasions, Messrs. Petit, Senken and Cranston signed letters to the Company's outside auditors misrepresenting that the Company had no side deals or other arrangements that had not been disclosed to the outside auditors.

- In November 2016, after two former employees alleged that the Company had engaged in channel stuffing and improper revenue recognition practices, Messrs. Petit and Senken signed a letter to the Company's outside auditors misrepresenting that they had no knowledge of any allegations of fraud affecting the Company made by current or former employees.

25

- In early 2017, after the Audit Committee had retained counsel to investigate the allegations made by these former employees, Mr. Petit forwarded to the Board a set of written responses in which counsel for the Company's largest distributor explicitly stated that it only paid the Company for tissues after receiving payment from the distributor's customer. Mr. Petit misled the Board about the accuracy of the information provided by the distributor's counsel.

- Also in early 2017, the Company retained an outside expert to opine on the appropriateness of the Company's recognition of revenue from sales to its largest distributor. Messrs. Petit, Senken and Cranston made misrepresentations to the expert concerning the actual course of dealing between the Company and its largest distributor.

- In early 2017, in letters signed by Mr. Senken, the Company responded to comment letters received from the SEC's Division of Corporation Finance by misrepresenting that the Company's largest distributor was obligated to pay the Company, regardless of whether the distributor resold the product. As noted above, the Company routinely issued credits to the distributor for lost, damaged and missing tissues and received payments from the distributor based on the tissues purchased by the distributor's customer.

- In early 2018, the Company's former senior management prepared a misleading memorandum to the Company's outside auditors that misrepresented key facts regarding the Company's historical relationship with its largest distributor, which were relevant to determining the appropriate revenue recognition under GAAP.

- During a deposition, Mr. Petit falsely testified under oath that it was not true that the Company's largest distributor only paid the Company after the distributor had received a purchase order from its customer.

71.     Defendant Petit's gross misconduct included overseeing an internal investigation

that was conducted for the purpose of discrediting whistleblowers:

*Actions Taken Against Whistleblowers*

Further, the Investigation determined that the evidence demonstrated that Messrs. Petit and Taylor engaged in a pattern of taking action against employees who raised concerns about the Company's practices, without conducting a thorough investigation of those concerns. Instead, Messrs. Petit and Taylor focused on disputing the employees' allegations and on seeking to discredit or find wrongdoing by the persons raising the concerns that would justify re-assignment, discipline or termination. For example, after certain employees made allegations of improper accounting practices in late 2016, Mr. Petit directed and oversaw an internal investigation dubbed "Project Snow White" that focused on potential wrongdoing by these employees, rather than the merits of their allegations. As part of Project

Snow White, the secret video surveillance system referenced above was installed at Mr. Petit's direction to record interviews that he, Mr. Taylor and other former members of management conducted of certain employees and those employee's discussions amongst themselves without those employees' knowledge or consent. The evidence showed that Mr. Petit directed that certain employees, whom he and other former members of senior management perceived to hold loyalty to an employee who had raised concerns about the Company's practices, be terminated.

72.     The MiMedx Group further stated that Defendant Petit's behavior was so egregious that the possibility he would be elected to its board of directors made it difficult for it to engage an independent auditor:

> The Company's auditor, Ernst & Young LLP, resigned from the engagement to audit the Company's consolidated financial statements for the year ended December 31, 2017 citing a number of factors, some of which were related to the findings of the Investigation.
>
> The Company is working diligently to retain an independent auditor and regain compliance with the Company's reporting obligations under applicable securities laws. The Audit Committee and management have interviewed firms as part of the selection process and have been told that either they could not complete their acceptance process until it was known whether Mr. Petit were to be elected to the Board, or if they did complete the acceptance process, they would have to reassess their decision to continue with the engagement. Therefore, the Company believes that if Mr. Petit were to be elected to the Board or if Mr. Petit were to be re-hired in any management capacity, there would be a very high risk that the Company could not engage a new auditor or any previously engaged auditor would resign.

73.     On May 24, 2019, before market hours, Aurelius Value published a report entitled "INS: A Wolf in Pete's Clothing." The report discussed MiMedx Group's disclosures concerning Defendant Petit and also accused the Company's CEO, Defendant Strange, *inter alia,* of having engaged in undisclosed related-party transactions with Defendant Petit and others and of having an undisclosed personal relationship with INS's auditor, Nicolas Cauley. *See* Exhibit A attached.

74.     On this news, shares of Intelligent Systems fell $4.18 per share, or more than 10%, to close at $34.93 per share on May 24, 2019, damaging investors.

75.     Despite these shocking revelations, Intelligent Systems took no action to remove Mr. Petit from the Board.

76.     On May 30, 2019, before the market opened, Grizzly Research LLC issued a report entitled "Intelligent Systems Corp: Material Undisclosed Related Party Transactions Cast Doubt on the Integrity of Financial Statements." The report presented evidence that "Intelligent Systems Corp. (INS) has its employees set up or take control of undisclosed shell companies in Asia, who then partake in undisclosed related party transactions with INS intended to either **round-trip revenue back to INS or siphon money out of the company.**" (emphasis in original). It further stated that "there is a possibility that all revenue growth since January 2018 has been a result of undisclosed round-trip transactions with Indian related parties." *See* Exhibit B attached.

77.     On this news, shares of Intelligent Systems fell $6.82 from the prior day's closing price of $33.81 or over 20%, to close at $26.99 per share on May 30, 2019, further damaging investors.

78.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## POST CLASS PERIOD

79.     On August 5, 2019, Intelligent Systems filed a Form 8-K with the SEC, attaching a brief resignation letter from Mr. Petit dated August 1, 2019.  In the 8-K, the Company made clear that, "Mr. Petit's resignation was not as a result of any disagreement with the Company or any of its subsidiaries on any matters related to their operation, policies or practices." Similarly, Mr. Petit's resignation letter simply attributed his departure to his advanced age.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Intelligent Systems securities publicly traded on the NYSE American during the

Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Intelligent Systems, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

81.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Intelligent Systems securities were actively traded on the NYSE American. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

82.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

83.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

84.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Intelligent Systems;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Intelligent Systems to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and SEC filing

- whether the prices of Intelligent Systems' securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

85.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

86.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Intelligent Systems shares met the requirements for listing, and were listed and actively traded on the NYSE American, a highly efficient and automated market;

- As a public issuer, Intelligent Systems filed periodic public reports with the SEC;

- Intelligent Systems regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Intelligent Systems was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

87. Based on the foregoing, the market for Intelligent Systems securities promptly digested current information regarding Intelligent Systems from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

88. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

89. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

91.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

-  engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Intelligent Systems securities during the Class Period.

93.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Intelligent Systems were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Intelligent Systems, their control over, and/or receipt and/or modification of Intelligent Systems' allegedly materially misleading statements, and/or their associations with the Company which made them

privy to confidential proprietary information concerning Intelligent Systems, participated in the fraudulent scheme alleged herein.

94. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Intelligent Systems personnel to members of the investing public, including Plaintiff and the Class.

95. As a result of the foregoing, the market price of Intelligent Systems securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Intelligent Systems securities during the Class Period in purchasing Intelligent Systems securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

96. Had Plaintiff and the other members of the Class been aware that the market price of Intelligent Systems securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Intelligent Systems securities at the artificially inflated prices that they did, or at all.

97. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

98. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members

of the Class for substantial damages which they suffered in connection with their purchase of Intelligent Systems securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

99.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

100.     During the Class Period, the Individual Defendants participated in the operation and management of Intelligent Systems, and conducted and participated, directly and indirectly, in the conduct of Intelligent Systems' business affairs. Because of their senior positions, they knew the adverse non-public information about Intelligent Systems' misstatement of revenue and profit and false financial statements.

101.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Intelligent Systems' financial condition and results of operations, and to correct promptly any public statements issued by Intelligent Systems which had become materially false or misleading.

102.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Intelligent Systems disseminated in the marketplace during the Class Period concerning Intelligent Systems' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Intelligent Systems to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Intelligent Systems within the meaning of Section 20(a) of the

Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Intelligent Systems securities.

103.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Intelligent Systems.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Class Counsel;

(b)    awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  November 18, 2019                    Respectfully submitted,

                                             **POMERANTZ LLP**

                                             */s/ Tamar A. Weinrib*
                                             Jeremy A. Lieberman
                                             Tamar A. Weinrib
                                             600 Third Avenue, 20th Floor
                                             New York, New York 10016
                                             Telephone: (212) 661-1100
                                             Facsimile: (212) 661-8665

Email:  jalieberman@pomlaw.com
         taweinrib@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**SCHALL LAW FIRM**
Brian Schall (SBN 290685)
1880 Century Park East
Suite 404
Los Angeles, California 90067
Phone: (310) 301-3335
Fax: (310) 388-0192
Email: brian@schallfirm.com

*Attorneys for Lead Plaintiff*