UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

EDGARDO CANEZ, *individually and on
behalf of all others similarly situated*,

                  Plaintiff,

            -against-

INTELLIGENT SYSTEMS
CORPORATION, J. LELAND STRANGE,
MATTHEW A. WHITE, A. RUSSELL
CHANDLER III, PHILLIP H. MOISE,
PARKER H. PETIT, CHERIE M.
FUZZELL, JAMES V. NAPIER, BONNIE
L. HERRON, and KAREN J. REYNOLDS,

                  Defendants.
-----------------------------------------------------x

**MEMORANDUM AND ORDER**
19-CV-3949 (RPK) (CLP)

RACHEL P. KOVNER, United States District Judge:

      In an amended class action complaint, Edgardo Canez alleges that Intelligent Systems

Corporation ("Intelligent Systems" or "INS") violated Section 10(b) of the Securities and

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), by making misleading statements in

various filings.  Canez also alleges that several Intelligent Systems officers and directors are liable

under Section 20(a) of the Exchange Act for the violations committed by the company.  For the

reasons set out below, defendants' motion to dismiss the amended complaint is granted.

## BACKGROUND

      The following comes from the amended complaint, documents integral to the complaint,

documents incorporated into the complaint, and documents amenable to judicial notice.

The allegations in the amended complaint are "accept[ed] as true" on a motion to dismiss.

*Hamilton v. Westchester Cnty.*, 3 F.4th 86, 90-91 (2d Cir. 2021) (quoting *Dane v.

UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020)).

1

A.      **Factual Background**

Intelligent Systems is a "FinTech" company.  Am. Compl. ¶ 2 (Dkt. #39).  As alleged, it "provides technology solutions and processing services to the financial technology and services market in the United States and the European Union" through its subsidiary CoreCard Software, Inc.  *Id.* ¶ 25.  The President, CEO, and Chairman of the Board for Intelligent Systems is J. Leland Strange.  *Id.* ¶ 11.  One of the directors of Intelligent Systems was Parker H. Petit.  *Id.* ¶ 19.  Mr. Petit sat on the Intelligent Systems Board as well as its Audit Committee and Compensation Committee.  *Id.* ¶ 34. The amended complaint alleges that from May 23, 2014 through May 29, 2019, Intelligent Systems made materially false or misleading statements in public filings.

1.      **Parker H. Petit as "Financial Expert"**

The first set of allegations concerns statements identifying Parker H. Petit as a "financial expert."  *Id.* ¶¶ 34-35.  On May 23, 2014, Intelligent Systems announced that shareholders had elected Mr. Petit to its board of directors.  *See id.* ¶ 41.  Before the vote, the board filed a proxy statement explaining that "[t]he Board has determined that Mr. Petit and [another person] are financial experts as defined by the rules of the [Securities and Exchange Commission], and are financially sophisticated as defined in the listing standards of [the New York Stock Exchange]."  *Ibid.*  The board "based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies."  *Ibid.*  The board also stated that Mr. Petit was a "financial expert" in nearly identical proxy statements before annual shareholder meetings in 2015, 2016, 2017, 2018, and 2019.  *See id.* ¶¶ 46, 50, 54, 61, 66.

The amended complaint alleges that Mr. Petit in fact "did not qualify as a 'financial expert.'"  *Id.* ¶ 35.  The complaint notes that Mr. Petit was the CEO for the MiMedx Group, Inc.,

from February 2009 until June 2018. *Id.* ¶ 19. But it alleges that, as CEO for the MiMedx Group, Mr. "Petit went to elaborate lengths to hide pervasive accounting malfeasance." *Id.* ¶ 35. Specifically, Mr. Petit allegedly "made false statements to the SEC and the MiMedx Board of Directors," submitted "false documents to the auditors," purposely "took action to disregard revenue recognition rules," and directed "a secret surveillance system used to retaliate against whistleblowers." *Ibid.* The complaint alleges that Mr. Petit was ultimately "terminated for cause for engaging in egregious accounting fraud and retaliating against whistleblowers." *Id.* ¶ 67.

## 2. Parker H. Petit as "Independent Director"

A second set of allegations concerns statements identifying Mr. Petit as an "independent director." *Id.* ¶ 36. The board's proxy statement before the annual shareholder meeting in 2014 states that "[t]he Board has determined that Mr. Petit is an independent director under the applicable rules of the [New York Stock Exchange]." *Id.* ¶ 41. That statement also explains that "[a]ll members of the Audit Committee," which included Mr. Petit, "currently meet the applicable independence and qualifications standards of the [New York Stock Exchange]." *Ibid.* The proxy statement further represents that the Compensation Committee consisted of "three independent directors," including Mr. Petit. *Ibid.* And the statement explains that Mr. Petit "participate[s] in the consideration of director nominees" as someone who "meet[s] the applicable [New York Stock Exchange] independence requirements." *Ibid.* The board made nearly identical statements in 2015, 2016, 2017, 2018, and 2019. *See id.* ¶¶ 46, 50, 54, 61, 66.

The amended complaint alleges that Mr. Petit lacked independence because he "had undisclosed financial dealings" with Intelligent Systems CEO Leland J. Strange. *Id.* ¶ 36. Specifically, it alleges that Mr. Petit and Mr. Strange partnered together on real estate deals in Naples, Florida as co-officers of a Florida entity named Atrix Reality, Inc." *Ibid.* It notes that Mr. Strange "held the role of Director at Healthdyne Technologies," which was one of Mr. Petit's "old

companies." *Ibid.* And it notes that Mr. Petit and Mr. Strange are "both listed as Trustees Emeritus of the Georgia Tech Foundation" with another member of the board. *Ibid.*

### 3. Omitted Personal Relationships

A third set of allegations concerns statements identifying relevant director "relationships." *Id.* ¶ 44. On February 18, 2015, Intelligent Systems filed its annual report on Form 10-K for the fiscal year ending on December 31, 2014. *Ibid.* The 2014 10-K included a section that listed "[c]ertain [r]elationships" that may be relevant to shareholders. *Ibid.* Intelligent Systems also included this information in its annual reports for the 2015, 2016, 2017, and 2018 fiscal years, *see id.* ¶¶ 48, 52, 59, 64, as well as annual proxy statements for 2015, 2016, 2017, 2018, and 2019, *see id.* ¶¶ 46, 50, 55, 62, 68. Those disclosures also failed to note the prior professional contacts between Mr. Strange and Mr. Petit. *Id.* ¶ 45. And they omitted the fact that Mr. Strange "had an undisclosed personal relationship with [Intelligent Systems'] auditor." *Ibid.* Specifically, according to the complaint, Mr. Strange led "a five-month development process together" with the auditor's engagement partner as "leaders of the same church." *Id.* ¶ 37.

### 4. Omitted Related-Party Transactions

A final set of allegations concerns statements identifying "related party transactions." *Id.* ¶¶ 33, 38-39. The 2014 10-K for Intelligent Systems listed "[r]elated [t]ransactions" that may be relevant to shareholders. *Id.* ¶ 44. Intelligent Systems also included this information in its annual reports for the 2015, 2016, 2017, and 2018 fiscal years, *see id.* ¶¶ 48, 52, 59, 64, as well as annual proxy statements for 2015, 2016, 2017, 2018, and 2019, *see id.* ¶¶ 46, 50, 55, 62, 68.

The amended complaint alleges that those filings were misleading because they omitted "additional related party transactions." *Id.* ¶ 33. Specifically, the amended complaint alleges that the filings should have disclosed that "Intelligent Systems made investments in a company called Lumense even though [Mr.] Strange was Chairman of Lumense at the time." *Id.* ¶ 38.

4

In addition, the amended complaint alleges that public filings should have provided additional information about a $235,000 loan to a company named Flexopt Technology. *See id.* ¶ 39. The amended complaint notes that Intelligent Systems disclosed in its 2017 10-K that it loaned $235,000 to an unidentified "private limited company in India in the FinTech industry." *Ibid.* The 2017 10-K also disclosed that the company in India later "entered into a three year [p]rocessing [a]greement with CoreCard," which is a subsidiary of Intelligent Systems. *See* D. Kistenbroker Decl., Ex. 12, at F-19 (Dkt. #66-14). The amended complaint alleges that Intelligent Systems failed to disclose that the company in India was Flexopt Technology; that Flexopt Technology was founded by Anupam Pathak; and that Mr. Pathak was "the managing director of Intelligent System's India subsidiary." Am. Compl. ¶ 39. The amended complaint further alleges that Intelligent Systems failed to disclose that the loan reflected "roundtripping" because the loan to Flexopt was $235,000, and the subsequent "processing agreement for CoreCard services amount[ed] to at least the $235,000 investment that Intelligent Systems made in Flexopt." *Ibid.*

\*\*\*

As alleged in the amended complaint, on May 23, 2019, after market hours, MiMedx Group filed a Form 8-K with the SEC that "stated that an investigation by its audit committee found that [Mr.] Petit engaged in accounting fraud when he was CEO of MiMedx Group." *Id.* ¶ 70. The investigation "revealed accounting irregularities regarding the recognition of revenue under generally accepted accounting principles"; found evidence that Mr. Petit was "aware of [MiMedx]'s course of dealing"; found evidence that Mr. Petit "made material misstatements and omissions about [MiMedx]'s course of dealing"; and found evidence that Mr. Petit "engaged in a pattern of taking action against employees who raised concerns about [MiMedx]'s practices," including installing a "secret video surveillance system." *Id.* ¶¶ 70-71.

5

The next day, before market hours, an analyst named Aurelius Value posted a report entitled "INS: A Wolf in Pete's Clothing."  Am. Compl., Ex. A, at 1 (Dkt. #39-1).  The report posted a screenshot of the findings from MiMedx's internal investigation into Mr. Petit's conduct. *Id.* at 5.  The report then summarized "the elaborate lengths that Petit and his confederates went to hide the pervasive malfeasance at MiMedx."  *Ibid.*

The Aurelius Value report further alleged that Mr. Petit was a director at Intelligent Systems only because he had "undisclosed personal ties to company gatekeepers."  *Ibid.*  The report stated that Mr. Petit and Mr. Strange had "partnered together on real estate deals in Naples," Florida, linking to a corporate filing with the Florida Secretary of State that "lists them as co-officers of a Florida entity named Atrix, Reality, Inc."  *Id.* at 6.  The report stated that Mr. "Strange was a Director at Healthdyne Technologies, one of Petit's old companies," linking to a 10-Q Form filed by Healthdyne Technologies, Inc., that listed Mr. Strange as a director.  *Ibid.*  And the report stated that both were "listed as Trustees Emeritus of the Georgia Tech Foundation," linking to the "Board Officers" section of the website for Georgia Tech Foundation, Inc.  *Id.* at 7.

In addition, the Aurelius Value report alleged that Mr. "Strange has undisclosed personal ties" to the auditor for Intelligent Systems.  *Id.* at 8.  It noted that Mr. Strange and the auditor's engagement partner led "a five-month development process together" as "leaders of the same church" according to "a book published by the church pastor."  *Ibid.*  The report also noted that the auditor's "only publicly traded audit client is" Intelligent Systems.  *Ibid.*

Lastly, the Aurelius Value report alleged that Intelligent Systems potentially had "undisclosed related party dealings involving" a company named Lumense that developed sensors. *Id.* at 9.  The report stated that Intelligent Systems made a minority investment in Lumense.  *Ibid.*

6

And the report linked to a press release from a non-profit called the Georgia Research Alliance that stated that Mr. Strange served as "Lumense's Board Chairman." *Ibid.*

The amended complaint alleges that on the day the Aurelius Value report was released, "shares of Intelligent Systems fell $4.18 per share, or more than 10%." Am. Compl. ¶ 74.

As alleged in the amended complaint, a week later, on May 30, 2019, before the market opened, a firm named Grizzly Research LLC issued another report, entitled "Intelligent Systems Corp: Material Undisclosed Related Party Transactions Cast Doubt on the Integrity of Financial Statements." Am. Compl., Ex. B., at 1 (Dkt. #39-2). The report alleged that Intelligent System entered into undisclosed related-party transactions with a company named Flexopt Technology. *See id.* at 10. The report reprinted the section of Intelligent Systems' 2017 10-K where the company stated that it entered into a loan agreement "with a private limited company in India in the FinTech industry" in which it "committed to advance $235,000," and the private limited company then "entered into a three year [p]rocessing [a]greement with CoreCard." *Id.* at 5. The report concluded that the company in India was a company named Flexopt Technology from "financial statements filed with the Indian Ministry of Corporate Affairs" that showed Intelligent Systems's "initial $235,000 investment." *Id.* at 6. The report also concluded that Flexopt Technology was founded by "the managing director of [Intelligent Systems'] India subsidiary" based on a website that aggregates registration information with India's Ministry of Corporate Affairs. *See id.* at 9. The report ultimately concluded that Intelligent Systems "has its employees set up or take control of undisclosed shell companies in Asia, who then partake in undisclosed related party transactions with INS intended to either round-trip revenue back to INS or siphon money out of the company." *Id.* at 1.

The amended complaint alleges that on this news, on the day of this report's release, "shares of Intelligent Systems fell $6.82 from the prior day's closing price of $33.81[,] or over 20%." Am. Compl. ¶ 77.

### B.   Procedural History

Edgardo Canez was among the investors whose shares fell. *Id.* ¶¶ 1, 9; *see* Mem. of L. in Supp. of Mot. of Edgardo Canez for App't as Lead Pl. and Approval of Lead Counsel at 10 (Dkt. #29); Jeremy A. Lieberman Decl., Ex. A (Dkt. #30).  On September 26, 2019, Mr. Canez was appointed lead plaintiff in this action to represent a class consisting of all persons who purchased or otherwise acquired securities from Intelligent Systems between January 23, 2019 and May 29, 2019.  *See* Order at 1-2 (Dkt. #35).  Pomerantz LLP was appointed lead counsel.  *Ibid.*

Plaintiff filed the operative complaint on November 18, 2019.  *See* Am. Compl. at 35.  The amended complaint names Intelligent Systems as a defendant.  *Id.* ¶¶ 10-11, 19.  Plaintiff also sued Mr. Strange, Mr. Petit., and other members of the board of directors for Intelligent Systems, including former Chief Financial Officer ("CFO") Matthew A. White; former CFO Bonnie L. Herron; former CFO Karen J. Reynolds; current director A. Russell Chandler III; current director Phillip H. Moise; former director Cherie M. Fuzzell; and former director James V. Napier.  *See id.* ¶¶ 12-18.  The first cause of action of the amended complaint asserts that defendants made false or misleading statements in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and the SEC's Rule 10b-5, promulgated thereunder, 17 C.F.R. § 240.10b-5.  *See* Am. Compl. ¶¶ 89-98.  The second cause of action asserts that the individual defendants are liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  *See id.* ¶¶ 99-103.

Defendants move to dismiss the amended complaint under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure as well as the Private Securities Litigation Reform Act of 1995

("PSLRA"), 15 U.S.C. § 78u-4 *et seq.* *See* Notice of Defs.' Mot. to Dismiss Pl.'s Am. Class Action Compl. at 1 (Dkt. #66).

## STANDARD OF REVIEW

In general, to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This means, for example, that a complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. A complaint is also properly dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

A complaint alleging securities fraud must also satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA by "stating with particularity the circumstances constituting fraud." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)). To satisfy these requirements, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 94 (2d Cir. 2018) (quoting *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015)). The PSLRA further requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(2)).

**DISCUSSION**

Defendants' motion to dismiss is granted.  Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  Pursuant to that section, the SEC promulgated Rule 10b-5, which makes it unlawful "for any person, directly or indirectly . . . [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  To state a claim under these provisions, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Charles Schwab Corp.*, 883 F.3d at 92 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

Plaintiff has not stated a claim under these principles.  Allegations that defendants presented Mr. Petit as a "financial expert" and an "independent director" do not state a claim because plaintiff has not alleged facts indicating that those statements were misrepresentations. Allegations that defendants failed to disclose certain personal relationships do not state a claim because plaintiff has not adequately alleged that the omissions made any statement materially misleading.  Allegations that defendants did not disclose the Lumense transaction as a related-party transaction do not state a claim because plaintiff has not adequately alleged the transaction's materiality or loss causation.  And allegations that defendants did not disclose the Flexopt transaction as a related-party transaction do not state a claim because plaintiff has not adequately alleged scienter with respect to that transaction.  Accordingly, the amended complaint is dismissed.

### I.     Defendants' description of Mr. Petit as a "financial expert"

Plaintiff has not stated a claim based on defendants' statements in public filings that Mr. Petit was a "financial expert[] as defined by the rules of the SEC," Am. Compl. ¶ 41, because plaintiff has not alleged facts indicating that such statements were misleading.  To state a claim under Section 10(b) or Rule 10b-5, a plaintiff must identify "an untrue statement or a cognizable omission." *Kleinman v. Elan Corp., plc.*, 706 F.3d 145, 152 (2d Cir. 2013).  "The veracity of a statement or omission is measured . . . by its ability to accurately inform rather than mislead prospective buyers." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010).  Whether a statement is misleading is "evaluated not only by 'literal truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).

Plaintiff alleges that Mr. Petit was not in fact a "financial expert." *Id.* ¶ 35.  But plaintiff has not explained with particularity why defendants' description was false, within the meaning of that term "as defined by the rules of the SEC." *Id.* ¶ 41.  As defendants observe, the relevant SEC rules define expertise in terms of "certain experience and knowledge levels." Defs.' Reply Mem. in Further Supp. of Defs.' Mot. to Dismiss the Am. Class Action Compl. at 5 (Dkt. #66-43) ("Defs.' Reply").  Item 407 of Regulation S-K provides that "an audit committee financial expert" means "a person who has the following attributes":

> (A) An understanding of generally accepted accounting principles and financial statements;
> (B) The ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves;
> (C) Experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrant's financial statements, or experience actively supervising one or more persons engaged in such activities;
> (D) An understanding of internal control over financial reporting; and
> (E) An understanding of audit committee functions.

17 C.F.R. § 229.407(d)(5)(ii).  It also requires "an audit committee financial expert" to "have acquired such attributes through":

> (A) Education and experience as a principal financial officer, principal accounting officer, controller, public accountant or auditor or experience in one or more positions that involve the performance of similar functions;
> (B) Experience actively supervising a principal financial officer, principal accounting officer, controller, public accountant, auditor or person performing similar functions;
> (C) Experience overseeing or assessing the performance of companies or public accountants with respect to the preparation, auditing or evaluation of financial statements; or
> (D) Other relevant experience.

17 C.F.R. § 229.407(d)(5)(iii).  The statement that Mr. Petit was a "financial expert[] as defined by the rules of the SEC" thus simply represents that Mr. Petit had the requisite knowledge and experience to serve in that position on the Audit Committee.

The surrounding language confirms as much.  Immediately after stating that the board determined that Mr. Petit was a "financial expert," the proxy statement explains that the board made that determination based on his "experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies."  Am. Compl. ¶ 41.  That language tracks the SEC rules governing the knowledge and experience requirements for financial experts.

Plaintiff does not raise an inference that Mr. Petit lacked such experience or knowledge. Indeed, plaintiff accepts that Mr. Petit was the CEO for the MiMedx Group, Inc., from February 2009 to June 2018, *id.* ¶ 19, which suggests that Mr. Petit had the necessary experience and knowledge.  Instead, plaintiff alleges that Mr. Petit "went to elaborate lengths to hide pervasive accounting malfeasance."  *Id.* ¶ 35. But such malfeasance does not reflect that Mr. Petit did not understand, for example, how an audit committee functioned, or that he lacked experience overseeing one.  Likewise, while plaintiff suggests that Mr. Petit was not a financial expert because

he ultimately "terminated for cause" by MiMedx, *id.* ¶ 67; Lead Pl.'s Mem. of L. in Opp'n to Defs.' Mot. to Dismiss the Am. Class Action Compl. at 17 (Dkt. #66-27) ("Pl.'s Opp'n"), plaintiff does not allege that Mr. Petit was terminated because he lacked necessary knowledge or experience. Accordingly, plaintiff has not stated a claim based on allegations that defendants presented Mr. Petit as a "financial expert[] as defined by the rules of the SEC."

## II.   Defendants' presentation of Mr. Petit as an "independent director"

Plaintiff also has not stated a claim based on defendants' statements that Mr. Petit was an "independent director under the applicable rules of the [New York Stock Exchange]," Am. Compl. *id.* ¶ 41, because plaintiff has not pleaded facts that raise an inference that Mr. Petit lacked independence under those rules. The rules of the New York Stock Exchange state that a director is independent if he "has no material relationship with the listed company." NYSE Listed Company Manual § 303A.02(a)(i); *see* D. Kistenbroker Decl., Ex. 20, at 1 (Dkt. #66-22). Plaintiff suggests Mr. Petit was not independent because he had "undisclosed financial dealings" and other connections with Mr. Strange. *Id.* ¶ 36. But Delaware law—to which both parties turn for guidance on material relationships—does not suggest that Mr. Petit's contacts with Mr. Strange reflected an undisclosed material relationship. *See* Mem. of L. in Supp. of Defs.' Mot. to Dismiss the Am. Class Action Compl. at 15 (Dkt. #66-1) ("Defs.' Memo"); Pl.'s Opp'n at 16. Under Delaware law, a director is presumed independent. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004). To plead that a director lacks independence, a complaint must create a "reasonable doubt" that a director is so "beholden" to another director that his or her "discretion would be sterilized." *Id.* at 1050.; *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993). "Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Stewart*, 845 A.2d at 1050. That is especially true where a plaintiff relies primarily

on contacts between officers before they were elected.  *Cf. Certain Underwriting Members of Lloyds of London v. Fla., Dep't of Fin. Servs.*, 892 F.3d 501, 507 (2d Cir. 2018) ("[P]ast contacts do not amount to material bias.").

Plaintiff alleges only that Mr. Petit and Mr. Strange once "partnered together on real estate deals . . . as co-officers of a Florida entity"; that Mr. Strange once "held the role of Director" at one of Mr. Petit's "old companies"; and that both are "listed as Trustees Emeritus of the Georgia Tech Foundation."  Am. Compl. ¶ 36.  Plaintiff thus identifies nothing more than past outside business relationships and prior shared philanthropic activities.  *Cf. F5 Cap. v. Pappas*, 856 F.3d 61, 84-85 (2d Cir. 2017) (finding directors to be independent even though they also served together on the boards for a real estate fund and a private equity fund); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Lundgren*, 579 F. Supp. 2d 520, 530 (S.D.N.Y. 2008) (finding directors to be independent despite shared ties to non-profit organizations and universities); *In re Morgan Stanley Derivative Litig.*, 542 F. Supp. 2d 317, 325-26 (S.D.N.Y. 2008) (finding directors to be independent even though they were members of the same golf club).  Accordingly, plaintiff has not alleged facts supporting his claim that the description of Mr. Petit as an "independent director under the applicable rules of the [New York Stock Exchange]" was misleading.

## III.  Failure to Disclose Certain Personal Relationships

Similarly, plaintiff alleges that defendants violated Section 10(b) and Rule 10b-5 by failing to disclose that Mr. Strange led "a five-month development process" for his church with the engagement partner for Intelligent Systems' auditor.  Am. Compl. ¶ 37.  Plaintiff suggests that defendants should have disclosed that fact because the SEC "requires that auditors be 'capable of exercising objective and impartial judgment on all issues.'"  *Ibid.*  Further, plaintiff suggests that the omission rendered misleading a section entitled "Certain Relationships and Related Transactions" in Intelligent Systems' Form 10-K.  *See, e.g.*, *id.* ¶ 45.  Lastly, plaintiff asserts that

the omission rendered misleading declarations in proxy statements that the auditor was an "independent auditor." *See, e.g.*, *id.* ¶ 56.  None of these allegations state a violation of law.

First, plaintiff has not adequately alleged that any SEC rule about auditors obligated defendants to disclose Mr. Strange's contacts with the engagement partner.  Section 10(b) and Rule 10b-5 both require that "an actual statement" be made "untrue" or "misleading" by an omission in order to "support a finding of liability," so a "pure omission" is "actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts" imposed by another source of law.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016).  Plaintiff has not identified any provision that might require disclosure other than Section 10(b) and Rule 10b-5.  While plaintiff notes that the SEC requires that auditors be "capable of exercising objective and impartial judgment on all issues," 17 C.F.R. § 210.2-01(b); *see* Am. Compl. ¶ 37; Pl.'s Opp'n at 14, that rule describes the qualities necessary to be an auditor; it does not compel any disclosure.

Second, plaintiff has not stated with particularity how the omitted contacts between Mr. Strange and the auditor's engagement partner rendered the "Certain Relationships and Related Transactions" section misleading.  Again, to satisfy Rule 9(b)'s heightened pleading requirements, a complaint must at least "specify the statements that the plaintiff contends were fraudulent" and "explain why the statements were fraudulent."  *Charles Schwab Corp.*, 883 F.3d at 94.  The amended complaint does not sufficiently detail what statement Intelligent Systems made when it listed certain relationships and transactions under that heading in their Form 10-K filing, how a "reasonable investor" would have understood those submissions, *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015), and why omitting contacts between Mr. Strange and the auditor's engagement partner rendered that statement misleading.

Third, plaintiff has not alleged facts supporting the inference that the proxy statements were misleading because they described Intelligent Systems' auditor as "independent." Courts look to the SEC's auditor-independence rules for guidance on whether an auditor is independent. *See, e.g.*, *Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97-CV-3374, 1999 WL 101772, at *8 (S.D.N.Y. Mar. 1, 1999); *Kress v. PricewaterhouseCoopers LLP*, No. 08-CV-0965, 2013 WL 140102, at *8 (E.D. Cal. Jan. 10, 2013). Rule 210.2-01(b) of Regulation S-X provides that an auditor lacks independence "if the accountant is not, or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that the accountant is not, capable of exercising objective and impartial judgment on all issues encompassed within the accountant's engagement." 17 C.F.R. § 210.2-01(b). Plaintiff has not alleged facts sufficient to infer that a reasonable investor would conclude that defendants' auditor was not capable of exercising objective and impartial judgment. Plaintiff emphasizes that the auditor's engagement partner "served as leaders of the same church" and "lead a five-month development process together." Am. Compl. ¶ 37. But such contacts are not "suggestive of the type of very close personal relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment." *Sandys v. Pincus*, 152 A.3d 124, 130 (Del. 2016) (describing facts required to compromise director independence). Plaintiff has not identified any authority that indicates otherwise. In addition, such contacts are "entirely unlike" the ones that Delaware courts have found "sufficiently close to raise a reasonable doubt concerning director independence," such as facts that "signaled an extremely close, personal bond between" two directors "and between their families." *F5 Cap.*, 856 F.3d at 85. Further, such contacts are entirely unlike those found to warrant enforcement orders against auditors from the SEC. *See, e.g.*, *In the Matter of Ernst & Young LLP & Gregory S. Bednar, Cpa, Respondents.*, SEC Release No. 3802, 115 SEC Docket 16, 2016 WL 4983301, at *5 (Sept. 19, 2016) (finding

that an auditor violated rules where the coordinating partner for an auditor spent $109,000 in entertainment-related expenses for the Chief Financial Officer of the client and his family); *In the Matter of Ernst & Young LLP, Robert J. Brehl, Cpa, Pamela J. Hartford, Cpa, & Michael T. Kamienski, Cpa Respondents.*, SEC Release No. 3803, 115 SEC Docket 25, 2016 WL 4983302, at *2 (Sept. 19, 2016) (finding that an auditor violated rules where a partner for the auditor and the chief accounting officer for the client maintained a romantic relationship during the audit). Accordingly, I cannot say that plaintiff's allegations, if true, raise an inference that a reasonable investor would think that Intelligent Systems' auditor lacked independence here.

Likewise, plaintiff has not raised an inference that the relationship would be material to a reasonable investor. An omission is actionable under Section 10(b) and Rule 10b-5 only if it is "material." *Charles Schwab Corp.*, 883 F.3d at 92. An omission is material only if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). Because plaintiff's allegations do not suggest the type of relationship that would undermine the auditor's impartiality, the contacts between Mr. Strange and the engagement partner would not significantly alter the total mix of information available to a reasonable investor. To the contrary, an obligation to disclose such information would "inundate the market with unnecessary disclosures." Defs.' Memo at 12 n.13.

In plaintiff's brief in opposition, plaintiff also emphasizes that Intelligent Systems' auditor had "no other publicly traded audit clients." Pl.'s Opp'n at 14. Although the Aurelius Value report suggests that fact, *see* Am. Compl., Ex. A, at 8 (Dkt. #39-1), plaintiff did not allege it with particularity, *see Charles Schwab Corp.*, 883 F.3d at 94. In any event, that fact also does not raise an inference that the auditor lacks independence. Such a fact is consistent with a "strictly

professional" relationship.  *Cf. Landmark Ventures, Inc. v. InSightec, Ltd.*, 619 F. App'x 37, 39-40 (2d Cir. 2015) (summary order) (declining to find an arbitrator partial where arbitrator had strictly professional contacts with attorneys on the matter).  Accordingly, plaintiff cannot rely on the auditor's limited client pool to raise an inference of impartiality.  Plaintiff has not stated a claim based on undisclosed contacts between Mr. Strange and the auditor's engagement partner.

## IV.    Omitted related-party transactions

Lastly, plaintiff has not stated a claim based on his allegations that defendants violated generally accepted accounting principles ("GAAP") when defendants failed to adequately disclose certain related-party transactions.  *See* Am. Compl. ¶ 30.  Those principles require financial statements to "include disclosures of material related party transactions."  Statement of Financial Accounting Standards No. 57 ("SFAS No. 57").  "Related parties" include "[a]ffiliates of the enterprise," "its management," and "other parties . . . if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests."  *Id.* ¶ 24(f).  In general, to state a claim for securities fraud based on a violation of GAAP, a plaintiff must allege with particularity not only that a defendant violated GAAP but also that the defendant did so with "fraudulent intent."  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).  Further, a plaintiff must allege facts indicating that "that the defendant's misrepresentation 'caused the loss for which the plaintiff[s] seek[] to recover.'"  *Abrahmson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quoting *Dura Pharms.*, 554 U.S. at 345-46).

Plaintiff argues that Intelligent Systems should have listed two additional transactions in its related-party disclosures: one with a company named Lumense, and one with a company named Flexopt Technology.  *See* Am. Compl. ¶¶ 38-39.  Allegations relating to Lumense do not state a claim because plaintiff has not adequately alleged that the Lumense transaction was material or

that its omission from public filings caused plaintiff's losses.  Allegations relating to Flexopt do not state a claim because plaintiff has not adequately alleged that defendants omitted the Flexopt transaction with fraudulent intent.

### A.    Lumense

Plaintiff fails to state a claim through his allegations that defendants violated Section 10(b) or Rule 10b-5 by failing to disclose certain information regarding investments in a company named Lumense.  Plaintiff alleges that defendants violated SFAS No. 57 because they did not disclose "that Intelligent Systems made investments in a company called Lumense even though [Mr.] Strange was Chairman of Lumense at the time."  *Id.* ¶ 38.  SFAS No. 57, however, obligates a company to include only "material related party transactions," and the amended complaint does not allege with particularity any facts supporting an inference that those investments were material. *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 202 (2d Cir. 2009).  A plaintiff must allege with particularity facts to support an inference that the transaction was "material."  *Ibid.*  Dismissal is appropriate where a plaintiff "fail[s] to plead materiality adequately."  *Ibid.*  Plaintiff argues that the Lumense investments were material only in his brief in opposition to dismissal, relying on information not set out in the complaint.  *See* Pl.'s Opp'n at 12-14.  Because the amended complaint does not contain any facts supporting such an inference, plaintiff's arguments in his opposition brief are inadequate to avoid dismissal.

Plaintiff's pleading concerning Lumense also falls short because plaintiff has not adequately alleged loss causation.  To plead loss causation, a plaintiff must plead that an omission was both the but-for and proximate cause of the plaintiff's loss.  *Abrahmson*, 965 F.3d at 179.  A fraudulent omission is the proximate cause of a loss if it "concealed something from the market that, when disclosed' would foreseeably and 'negatively affect[] the value of the security.'"  *Ibid.* (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir 2005)).  Plaintiffs

frequently plead loss causation—as plaintiff does here—by alleging "that their share's 'price fell significantly after the truth became known' through an express, corrective disclosure.'" *Ibid.* (quoting *Dura Pharms., Inc.*, 544 U.S. at 347).   To constitute a corrective disclosure, however, a disclosure must "reveal some then-undisclosed *fact* with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). A disclosure is not "'corrective' for the purpose of pleading loss causation" if it merely expresses negative opinions "based on information that was already publicly available." *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) (summary order).   "[A] negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Grp.*, 597 F.3d at 512.

Plaintiff has not adequately pleaded that omitting the Lumense transaction caused his losses under these principles.   Plaintiff relies on a report by an analyst named Aurelius Value as a corrective disclosure. *See* Am. Compl., Ex. A.   But that report did not disclose any new facts about the Lumense transaction; it merely expressed opinions "based on information that was already publicly available." *Cent. States, Se. & Sw. Areas Pension Fund*, 543 F. App'x at 75.   Aurelius Value concluded that Intelligent Systems had conducted a related-party transaction with Lumense from two facts that were already publicly available—that Mr. "Strange was the Chairman of Lumense" and that Mr. Strange "held a personal stake" in Lumense.   Am. Compl., Ex. A., at 9.   In the analyst report, Aurelius Value linked to the very "online report[]" that contained this information—a press release that stated that Mr. Strange had previously provided funding to Lumense and now served as "Lumense's Board Chairman" while serving as "CEO and Chairman of Intelligent Systems Corporation." *Ibid.*   Because the Lumense-related disclosures that plaintiff

20

relies on as corrective disclosures merely republished information that was already publicly available, those disclosures are not corrective for purposes of pleading loss causation.

Plaintiff protests that it is not enough that prior information be publicly available in some form, because the fact that a third-party analyst found the information "does not mean that a reasonable investor could have drawn those same conclusions based on the total mix of the available." Pl.'s Opp'n at 23 (quoting *In re Winstar Commc'ns*, No. 01-CV-11522, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006)). But the Second Circuit has foreclosed that argument. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 511. So long as a third-party report relied on facts "already publicly available," *Cent. States*, 543 F. App'x at 75, it is not corrective. To the extent district court opinions previously "express[ed] a different view of the legal standard for loss causation, they are no longer persuasive authority." *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 497 (S.D.N.Y. 2016). Plaintiff further notes that the Aurelius Value report did not rely "on public facts contained in the defendant company's own SEC filings." Pl.'s Opp'n at 24. But given "the realities of the accessibility of the internet," public facts may also be found in "news article[s]," "news release[s]," or press releases like the one here. *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 178 (E.D.N.Y. 2019), *appeal dismissed* (Aug. 14, 2019). Accordingly, plaintiff's allegations relating to the Lumense transaction do not state a claim.

B.    **Flexopt Technology**

Plaintiff fares no better in contending that defendants violated Section 10(b) or Rule 10b-5 by omitting details from filings about a transaction where Intelligent Systems loaned $235,000 to a company in India. *See* Am. Compl. ¶ 39. Plaintiff notes that Intelligent Systems disclosed that it loaned $235,000 to a "private limited company in India in the FinTech industry," and that the company in India later entered into a three-year processing agreement with a subsidiary of Intelligent Systems. *See ibid.* Plaintiff faults defendants for omitting the name of the company—

21

Flexopt Technology—from public filings, failing to disclose that Flexopt was founded by the managing director for Intelligent Systems' India subsidiary, and failing to disclose that the value of the subsequent processing agreement was equal or greater to the amount of the loan. *See ibid.*

Assuming that the loan to the company in India in fact constitutes a "material related party transaction" such that defendants should have disclosed additional details, SFAS No. 57, plaintiff has not stated with particularity facts giving rise to a strong inference that defendants acted with scienter when they omitted such facts. *See Novak*, 216 F.3d at 309.  The PSLRA requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. at 345 (quoting 15 U.S.C. § 78u-4(b)(2)).  A plaintiff can plead scienter "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000).  To plead a motive to commit fraud, a plaintiff must allege "that the individual defendants received a 'concrete and personal benefit' from making their alleged misrepresentations" or actionable omissions. *Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55, 57 (2d Cir. 2018) (summary order).  As a prerequisite to pleading conscious misbehavior or recklessness, a plaintiff typically must "specifically allege[] defendant's knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308.  And "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 309.

Plaintiff's allegations fall short under these principles.  The complaint does not state the facts supporting scienter with sufficient specificity.  Rather the complaint pleads scienter through a single untailored paragraph stating as to all the alleged omissions or misstatements in the

22

complaint that "defendants acted with scienter because of their "receipt of information reflecting the true facts of Intelligent Systems, their control over, and/or receipt and/or modification of Intelligent Systems' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Intelligent Systems."  Am. Compl. ¶ 93.  Plaintiff's use of this boilerplate "and/or" list as its grounds for scienter impermissibly "leave[s] the District Court . . . determine on its own initiative . . . how other facts might show a strong inference of scienter," *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (summary order), and thus "fall[s] far short of the particularity required in fraud claims brought under § 10(b) and Rule 10b–5," *id.* at 39.

Even setting aside the boilerplate nature of plaintiff's pleading, plaintiff has not pleaded scienter with sufficient specificity.  Plaintiff does not attempt to allege that defendants had a motive to commit fraud by omitting the information about the Flexopt transaction on which plaintiff focuses.  *See* Am. Compl; *see also* Pl.'s Opp'n at 17-22.  And plaintiff has not identified any "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino*, 228 F.3d at 168-69.  Plaintiff appears to suggest in his briefing that defendants had access to facts regarding Flexopt that placed defendants on notice that they should disclose the transaction as a material related-party transaction. Pl.'s Opp'n at 19; *see Novak*, 216 F.3d at 308.  "Where plaintiffs contend defendants had access to contrary facts" to public statements, however, "they must specifically identify the reports or statements containing this information." *Shetty v. Trivago N.V.*, 796 F. App'x 31, 35 (2d Cir. 2019) (summary order) (quoting *Novak*, 216 F.3d at 309); *see Boca Raton Firefighters and Police Pension Fund*, 506 F. App'x at 38.  Plaintiff's "failure to do so is sufficient to end the inquiry."  *Shetty*, 796 F. App'x at 35.  Because the complaint does not "specifically identify" internal reports or statements allegedly known to defendants that identified

the limited private company in India as Flexopt Technology, that identified Flexopt Technology as founded by the managing director for Intelligent Systems' India subsidiary, and that placed the value of the subsequent processing agreement at an amount equal or greater to the amount of the initial loan, plaintiff has not stated a claim.  *Cf. Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) (summary order); *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).

## V.    Allegations against the individual defendants under Section 20(a)

Plaintiff's claim against the individual defendants under Section 20(a) of the Exchange Act must also be dismissed.  Section 20(a) establishes liability for those who control persons or entities who violate provisions of the Exchange Act.  *See* 15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability," a plaintiff must first show "a primary violation by the controlled person."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  Because plaintiff fails to adequately plead a primary violation of the Exchange Act, his claims of control-person liability under Section 20(a) must also be dismissed.  *See ibid.*

## CONCLUSION

Defendants' motion to dismiss is granted.  Plaintiff has requested leave to further amend the complaint.  *See* Pl.'s Opp'n at 25.  The Federal Rules of Civil Procedure provide that courts should "freely give" leave to amend "when justice so requires," Fed. R. Civ. P. 15(a)(2), and amendment is especially appropriate when some allegations are dismissed under Rule 9(b).  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007); *Pehlvanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 657 (S.D.N.Y. 2015).  Accordingly, I dismiss plaintiff's claims without prejudice.  If plaintiff wishes to amend his pleadings, he shall file a motion within 21 days seeking leave to amend with the proposed Second

Amended Complaint attached as an exhibit.  The motion should explain how the Second Amended

Complaint addresses the pleading defects identified in this opinion.

       SO ORDERED.

                                      */s/  Rachel Kovner*
                                      RACHEL P. KOVNER
                                      United States District Judge

Dated:          August 18, 2021
                Brooklyn, New York